IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

ROBERT HILL,

        Petitioner,

v.

STEPHEN D'ILIO, *et al.*,

        Respondents.

HON. PETER G. SHERIDAN

Civil Action
No. 14-3706 (PGS)

**OPINION**

**SHERIDAN, District Judge:**

## I. INTRODUCTION

Petitioner Robert Hill has submitted an amended *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Am. Pet., ECF No. 5.) Petitioner's motion to expand the record is also pending before the Court. (*See* ECF No. 21.) For the reasons stated herein, the Court will grant Petitioner's motion to expand the record, but his petition will be denied and no certificate of appealability shall issue.

## II. BACKGROUND

As succinctly explained by the New Jersey Superior Court, Appellate Division, in its February 1, 2013 opinion affirming the denial of Petitioner's state court application for post-conviction relief:

> Sometime between 10:00 p.m. on May 17, 2002 and 2:00 a.m. on May 18, 2002, [Petitioner] killed his fiancée, Gwendolyn Boyd, by strangling her with a bungee cord. [Petitioner's] cousin, Michael Scott, attempted to help [Petitioner] dispose of Boyd's body.
>
> On February 8, 2005, [Petitioner] and Scott were indicted . . . and charged with second-degree conspiracy to commit murder, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:11-3a (count one), and first-degree murder, N.J.S.A. 2C:11-3a (1), (2) (count two). Scott agreed to plead guilty and testify against [Petitioner].

Following a jury trial, [Petitioner] was convicted of both counts.

*State v. Hill*, No. A-0201-10T4, slip op. at 1 (N.J. Super. Ct. App. Div. Feb. 1, 2013) (available at

ECF No. 14-15).

The Appellate Division, on direct appeal, summarized the facts underlying that conviction

as follows:[1]

> At approximately 1:30 p.m. on May 18, 2002, [Petitioner] Robert Hill knocked "heavily" on the door of his neighbor, John Winstanley. After observing [Petitioner] was sweating, breathing heavily, and had mucous coming out of his nose, Winstanley repeatedly asked [Petitioner] "what the problem was or what's the matter," but [Petitioner] did not "reply at all." Because he was unable to get any information from [Petitioner], Winstanley told his daughter to dial 9-1-1. As [Petitioner] started to leave, Winstanley told him that help was on the way, at which point [Petitioner] dropped to his knees and said, "She's dead. Mother F'er." Winstanley understood that [Petitioner] was referring to Gwendolyn Boyd, his fiancé, with whom he resided at 1854 Moore Road. Winstanley stood in his driveway watching as [Petitioner] returned to his residence.
>
> Minutes later, Officer Kevin Geoghegan of the Dover Township Police Department arrived at the scene. As he walked up to the front door at 1854 Moore Road he heard a male voice screaming and crying out. Geoghegan opened the screen door and began to enter through the partially-opened interior wooden door when he realized there was a female body clad only in panties lying face-up in the doorway. He quickly determined the victim was cold and had no pulse. Geoghegan then observed [Petitioner] sitting on the steps leading to the first floor of the split-level home. [Petitioner] was distraught, yelling "[w]ho could have done this? Why did this happen?"
>
> Shortly thereafter, Edward Spahr of the Dover Township Police Department arrived, and it was determined the victim was forty-year-old Gwendolyn Boyd. Although the police officers attempted to elicit information from [Petitioner], he was extremely agitated, and, for the most part, "he was not forthcoming with direct answers to direct simple questions."
>
> As more officers arrived at the scene, Geoghegan and Spahr asked [Petitioner] if he would accompany them to the police station to give a statement, and he agreed to do so. Spahr testified that as they left the house, [Petitioner] "was more

---

[1] State court factual findings are presumed correct unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). As Petitioner has not rebutted the factual findings of the Superior Court of New Jersey by clear and convincing evidence, this Court will rely on those findings.

concerned with looking out the window of the door than actually looking down at his fiancé." Detective James Pissott, of the Ocean County Prosecutor's Office, who was also present in the house as [Petitioner] was leaving, recalled [Petitioner] stating, "I don't want any cameras out there," and "Damn, why is [sic] there so many cops out there?"

Following [Petitioner's] departure, Pissott noticed a bungee cord near Boyd's body, as well as a rubber glove tip under one of Boyd's legs and another one next to her body. He also examined the body and noted there was a ligature mark on the neck. Dr. Hydow Park, the pathologist who performed an autopsy on Boyd's body, subsequently confirmed that she died from "ligature strangulation." At trial, Park would not give an estimated time of death, but he concluded Boyd had "been dead at least six hours, and probably twelve hours" when her body was discovered.

At the police station, Sergeant Vincent Frulio of the Ocean County Prosecutor's Office and another detective interviewed [Petitioner]. [Petitioner] stated he and Boyd had been together for two years, and he had moved into her Toms River home in January 2001. He related he had been unemployed since May 5, 2002, and he said he was trying to start an on-line business. He acknowledged he regularly used Boyd's Mitsubishi Montero because he did not own a car, and his cell phone was registered to Boyd.

[Petitioner] told the police he had driven Gwendolyn Boyd to the Newark school where she worked as a second-grade teacher on May 17, 2002, and then spent most of the day in the company of his girlfriend, Nadia Bryant. He later picked Boyd up around 3:30 p.m. and drove home after stopping briefly at a fast food restaurant to pick up some food for Boyd. He remained at the house with Boyd (except for a brief trip to a local restaurant to pick up some take-out food) until approximately 10:00 p.m., when he left to go visit friends in North Jersey.

During the trip north, [Petitioner] placed numerous calls to Michelle Simmons, another one of his girlfriends. [Petitioner] told the police he drove to various locations in Jersey City and East Orange in the hopes of seeing some friends, but he was unable to provide details of his whereabouts. Eventually, at approximately 2:30 a.m. on May 18, 2002, [Petitioner] went to Nadia Bryant's apartment in East Orange where he spent the rest of the night.

[Petitioner] consented to a search of Boyd's Montero, but he asked to be present when the vehicle was searched. Accordingly, the police took [Petitioner] to a motel for the night and then picked him up the next morning and drove him to 1854 Moore Road. Upon arriving at the house, Sergeant Frulio noticed [Petitioner] was shaking, and he appeared extremely nervous. During the search, [Petitioner] "became visibly upset" when the police told him he "would not be taking possession of the vehicle or have access to the residence" when the search was completed. At trial, Mitchell testified [Petitioner] "was shocked" when he was told he would not have access to Boyd's vehicle, and [Petitioner] stated: "What am I going to do now?"

When the search of the vehicle was completed, Mitchell asked [Petitioner] if he would return to the police station to speak with him. [Petitioner] agreed. During this interview, Detective Mitchell again reviewed [Petitioner's] activities on May 17 and 18, 2002. [Petitioner] told Mitchell that before he left home on the night of the 17th, he had received a phone call from Omar Byrd, the house painter he and Boyd had hired, who had advised him that he would be unable to make it the following day due to the weather. [Petitioner] also told Mitchell that he stayed with Nadia Bryant until about noon on May 18, and when he tried to telephone Boyd while he was driving home, he got no answer. In addition, [Petitioner] mentioned that after he returned from Winstanley's house, he touched Boyd and picked up the bungee cord lying nearby. At the end of the interview, [Petitioner] was given twenty dollars and driven to the Point Pleasant Train Station, so he could take the train to his mother's house in Roselle.

Over the course of the next few days, police determined there were no broken windows in the house and no sign of a forced entry, although a few windows were open. They found no fingerprints in the house other than [Petitioner's] and Boyd's. They submitted numerous items, including the two rubber glove fingertips, to the police lab for DNA analysis. They recorded the messages on Boyd's telephone answering machine, which ultimately turned out to be inaudible, and they confirmed Gwendolyn Boyd owned the home alone, and she died intestate. They also spoke to Michelle Simmons, Nadia Bryant, and Omar Byrd. During the course of their investigation the police discovered a number of Boyd's personal belongings, including her vehicle registration, Blue Cross/Blue Shield card, a paystub and a credit union statement, in a dumpster on Crane Street in Newark, near the home of one of [Petitioner's] former girlfriends with whom he was still in contact.

Based upon a review of [Petitioner's] cell phone records, the police learned that a call had been placed to Kadisha Little on the night of May 17. They subsequently learned that Little was the girlfriend of one Michael Scott, and they interviewed Scott on May 24, 2002.

[Petitioner] was not arrested for the murder of Boyd until July 2003. The DNA results from the glove tips did not come back until March 2004. The DNA of Gwendolyn Boyd and Michael Scott, but not [Petitioner], was identified in the fingertips of the rubber gloves. At that time Scott was also arrested for the murder of Gwendolyn Boyd. Following his arrest, Scott gave several statements to the police.

At trial, Scott testified that sometime prior to May 2002, [Petitioner] told him he had two girlfriends, who were both pregnant, and he asked Scott to help him "get rid of one of them." According to Scott, at approximately 10:00 p.m. on May 17, 2002, [Petitioner] telephoned him and said: "Well, today is the day. I'm tired. Got to get rid of – got to do this today." [Petitioner] subsequently picked Scott up at Scott's girlfriend's apartment on Crane Street in Newark. Scott's trial testimony included the following:

4

Q. Where did you go?

A. First we went to a gas station on Route 22. And then we went to Toms River.

Q. Did you have any conversation on the way down to Toms River?

Q. No.

. . . .

Q. Why were you going to Toms River?

A. To get rid of his problem.

Q. Did you arrive down at the house you just identified?

A. Yes.

Q. What happened when you got there?

A. I sat out in the truck. He pulled up on the side of the house. I sat in the truck. He went inside through a back door. And when I came in after a light came on, I heard rumbling and bumbling, stuff hitting the floor, whatever. I came in and I went upstairs.

Q. And what did you see when you got upstairs?

A. I came upstairs I seen Gwendolyn Boyd's body.

Q. Where was it?

A. Laying on the bed.

Q. Where was [Petitioner]?

A. Standing in the room.

Q. What did he say to you?

A. He didn't say anything much. He just said, here, take these. Help me move it.

Q. Here, take what?

A. Take these gloves and help me.

Q. What kind of gloves are you talking about?

A. Latex rubber gloves.

Q. And what did you do with the gloves.

A. I put the gloves on.

Q. And did you help move the body?

A. Yes.

Q. Did he tell you where the body was being moved to?

A. No.

Q. How did you grab the body? By the way, did anybody help you move the body?

A. Yes, he did.

Q. Anybody else in the house other than the two of you and the victim?

A. No.

Q. And how did you grab the body?

A. I grabbed the body by the upper torso.

. . . .

Q. You grabbed the upper torso. What does he do?

A. He grabs her down by the legs and stuff. And we start carrying her to the stairs.

Q. And how far did you get?

. . . .

A. The first four or five stairs that's right there on the landing. My back gave out.

Q. When you say your back gave out, what's the deal with your back?

A. I have a chipped disk in the lower back.

. . . .

Q. What did you tell him when your back gave out?

A. My back gave out. That's it. I'm done.

Q. Would you have physically been able to help move her any more?

A. No, sir.

Q. What did [Petitioner] do when you told him that?

A. He didn't do nothing. He walked back upstairs and proceeded to get her purse and whatever. And put a red bag by the front door.

Q. How about the gloves, what did you do with them?

A. I took them off and gave them to him.

. . . .

Q. Did you get anything out of this for helping him?

A. He gave me $60 in the house. And he gave me three rings.

Q. What did you do with the rings?

A. I sold them on the street for drugs and cash.

Q. How about the 60 bucks, what did you do with that?

A. When we first got back to Newark, I bought some drugs.

Q. Did you have any conversation on the way back with [Petitioner] about –

A. At one point, no. And then after I made two phone calls, then I had a conversation with him. A short conversation with him.

. . . .

Q. And tell us about the conversation you had with the [Petitioner]?

A. I asked him why. He said, I needed to take care of my kids. And that was that.

During his testimony, Scott admitted he was a drug dealer, and he was in prison on drug charges and for receiving stolen property. He testified he usually did drugs and drank heavily, and he was high on May 17, 2002. He admitted he had lied in his original statements to the police, and he conceded his plea agreement with the

State limited his maximum sentence to fifteen years in prison. He insisted, though, that he did not kill Gwendolyn Boyd.

Michelle Simmons testified she went to high school with [Petitioner], and they reconnected and began an intimate relationship in September 2001. She was married at the time and was aware that [Petitioner] was living in Toms River with Boyd in a house she believed they both owned. According to Simmons, [Petitioner] told her his relationship with Boyd was not working out, and he wanted to marry Simmons. [Petitioner] told Simmons he wanted to ask Boyd to give him the house so that he and Simmons could move in there together. Because [Petitioner] was insistent that he wanted to have children with Simmons, they did not do anything to prevent pregnancy, and every month [Petitioner] asked Simmons if she was pregnant.

Nadia Bryant testified she met [Petitioner] in 1999, but they did not begin dating until May 2002. She related that [Petitioner] told her he had bought a house in Toms River. She confirmed that [Petitioner] arrived at her apartment "at about" 3:00 a.m. on May 18, 2002, and he stayed with her through lunchtime.

Omar Byrd, the house painter, testified it was [Petitioner] who called him at approximately 8:00 p.m. on May 17, 2002, and cancelled his job for May 18.

Although [Petitioner] elected not to take the stand, his mother, Catherine McCallum, testified on his behalf that [Petitioner's] daughter, from a prior relationship, was due to visit with him in late May 2002. [Petitioner's] brother, Derrell McCallum, testified he spoke to Michael Scott sometime prior to May 18, 2002, and Scott told him that Boyd "had nice things in [her] house." According to McCallum, Scott also said "he would rob her" if he had the opportunity. Derrell admitted, however, that he only came forward with this information in April 2004.

*State v. Hill*, No. A-4536-05T4, 2008 WL 2875792, at *2-6 (N.J. Super. Ct. App. Div. July 28, 2008) (footnote in original omitted).

On January 27, 2006, the jury found Petitioner guilty of: (i) first-degree murder, N.J. Stat. Ann. § 2C:11-3a; and (ii) second-degree conspiracy to commit murder, N.J. Stat. Ann. §§ 2C:5-2, 11-3a. (*See, e.g.*, Feb. 24, 2006 J. of Conviction, ECF No. 14-3 at PageID: 177.) On March 28, 2003, Petitioner received a sentence of "life in the custody of the Commissioner of Corrections, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2." *Hill*, 2008 WL 2875792 at *1. The Appellate Division affirmed Petitioner's conviction and sentence on July 28, 2008. *Id.* at *14.

The New Jersey Supreme Court denied certification of Petitioner's direct appeal on October 31, 2008. (ECF No. 14-7.)

Petitioner thereafter filed an application for post-conviction relief ("PCR") in the New Jersey Superior Court, Law Division (the "PCR court"). The PCR court held a hearing on Petitioner's motion for post-conviction discovery on January 29, 2010. (Jan. 29, 2010 Tr., ECF No. 14-28.) The PCR court then held a non-evidentiary hearing on the merits of Petitioner's PCR application on March 3, 2010. (Mar. 3, 2010 PCR Hr'g Tr., ECF No. 14-29.) On April 8, 2010, the PCR court issued an order denying Petitioner's request for post-conviction relief. (ECF No. 14-9.) That order notes that Petitioner's PCR application was denied for the reasons stated on the record on March 3, 2010, and for the additional reasons detailed in the PCR court's April 8, 2010 written decision appended to its PCR denial order. (*Id.*)

Petitioner appealed the PCR court's decision to the Appellate Division. On October 20, 2011, that court ordered a limited remand for the PCR court "to consider [two] certifications of [Petitioner] dated [August 19, 2011 in which Petitioner claimed that his legs were shackled during trial in the presence of the jury and that Michael Scott wore prison garb and was shackled when he testified], and whatever other evidence relevant to the issue raised therein that the PCR [c]ourt deems appropriate." (ECF No. 14-11.) The evidence subsequently considered by the PCR court on this issue included certifications from Petitioner, his trial counsel, and the two prosecutors who tried his case. (*See, e.g.*, Dec. 14, 2011 Hr'g Tr. 6-7, ECF No. 14-30.) In addition, the PCR court heard testimony from Petitioner and the two prosecutors.[2] (*See id.* at 2.) On December 19, 2011,

---

[2] Petitioner, by way of his motion to expand the record, avers that the Appellate Division's October 20, 2011 limited-remand order required the PCR court to conduct an evidentiary hearing, and that the PCR court violated Petitioner's right to due process because it failed to "hold an evidentiary hearing." (*See* Pet'r's Decl. in Supp. of Mot., ECF No. 21 at PageID: 1113-14.) The

the PCR court issued a "Memorandum and Finding of Facts for Appellate Division on [PCR] Remand." (ECF No. 14-12) (capitalization in original omitted.)

The Appellate Division thereafter issued two separate opinions affirming the denial of Petitioner's PCR petition. It issued the first such opinion on February 1, 2013. *State v. Hill*, No. A-0201-10T4, slip op. (N.J. Super. Ct. App. Div. Feb. 1, 2013) (available at ECF No. 14-15.) In response, Petitioner "moved for reconsideration [of that decision] as he had requested oral argument." *State v. Hill*, No. A-0201-10T4, slip op. (N.J. Super. Ct. App. Div. Aug. 29, 2013) (available at ECF No. 14-17.) The Appellate Division granted Petitioner's reconsideration motion and held oral argument in May 2013. *See id.* at 2. On August 29, 2013, the Appellate Division issued its second opinion affirming the denial of Petitioner's PCR petition "for the reasons stated in [its] February 1, 2013 opinion." *Id.* at 7. The New Jersey Supreme Court denied certification of Petitioner's PCR appeal on March 31, 2014. (ECF No. 14-20.)

Petitioner initiated this § 2254 action on June 10, 2014. (Pet. ECF No. 1.) Petitioner filed his amended habeas petition on September 23, 2014. (Am. Pet., ECF No. 4.) That pleading raises the following points for this Court's review:

> Ground One: [Petitioner's] Constitutional rights were violated due to the conflict of interest between the trial judge and the prosecutor.

---

Court cannot agree. First, there is nothing in the terms of the Appellate Division's October 20th order that required the PCR court to conduct an evidentiary hearing. (ECF No. 14-11.) That order required only that the PCR court "consider [Petitioner's August 19, 2011 certifications] and "*whatever* other evidence . . . the PCR [c]ourt deem[ed] appropriate." (*Id.* (emphasis added).) The PCR court construed the terms of that order as requiring it to "act[] as almost a fact finder for the Appellate Division who has continued to retain jurisdiction." (Dec. 14, 2011 Hr'g Tr. 7, ECF No. 14-30.) In that regard, the PCR court noted that it "felt that it would be more appropriate [for the PCR court] to report back to the Appellate Division after hearing testimony" from Petitioner and the two prosecutors who tried the case. (*Id.*) The foregoing demonstrates that the PCR court acted appropriately in response to the Appellate Division's limited remand order, and that the subsequent proceedings it conducted in response in no way jeopardized Petitioner's right to due process. Petitioner is therefore not entitled to habeas relief based on his factually erroneous claim that the "[PCR] court failed to follow the [terms of Appellate Division's limited remand] order."

Ground Two: [Petitioner] was [denied] effective assistance of counsel [where]:
(A) Trial counsel . . . informed the jury that he advised [Petitioner] not to testify;
(B) Trial counsel failed to retain a forensic scientist as a defense expert to analyze the rubber glove finger tip with the bungee cord to determine whether the bungee cord caused the glove fingers to rip, which would have established that Co-Defendant Scott committed the murder;
(C) Trial counsel . . . fail[ed] to move for a mistrial when Investigator Mitchell continually spoke to Co-Defendant Scott during breaks and recesses [at trial], thereby violating the trial court's sequestration order.

Ground Three: . . . [T]rial counsel failed to call essential witnesses to testify at trial.

Ground Four: [(i) T]he trial court permitted [Co-Defendant Scott] to testify in prison clothing . . . [and; (ii) Petitioner's] feet were shackled at the defense table which could be seen by the jury.

Ground Five: [The manner in which the jury was charged caused the] guilty verdict [against Petitioner to be] inevitable, and thus must be reversed.

Ground [Six[3]]: [Petitioner] was denied his right to a fair trial as a result of the trial court's ruling precluding him from being physically present at sidebar conferences during jury [voir] dire.

(Am. Pet., ECF No. 5 (capitalization in original omitted).)

Respondents filed their answer on February 5, 2015. (ECF No. 14.) Petitioner filed a traverse, *i.e.*, a reply, on April 6, 2015. (ECF No. 16.) Petitioner thereafter filed a motion to supplement the record to include an additional argument related to his already-asserted Ground Four claims. (*See* ECF No. 21.) The Court will grant Petitioner's motion and will consider this newly-raised argument,[4] in addition to all of Petitioner's previously asserted habeas claims.

---

[3] Petitioner's habeas pleading inadvertently labels this claim as "Ground Five."

[4] For the reasons detailed in this Opinion at footnote 2, this additional claim fails to provide a basis to grant habeas relief to Petitioner.

## III. STANDARD OF REVIEW

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution, laws, or treaties of the United States. *See Engle v. Isaac*, 456 U.S. 107, 119 (1982); *see also Mason v. Myers*, 208 F.3d 414, 415 n.1 (3d Cir. 2000) (citing 28 U.S.C. § 2254). In accordance with the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104–132, 110 Stat. 1214 (Apr. 24, 1996), federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d).

As a threshold matter, a court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)). "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle set forth by the Supreme Court at the time the state court renders its decision." *Id.* (citations omitted). A federal habeas court making an unreasonable-application inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *See Williams v. Taylor*, 529 U.S. 362, 409 (2000). Thus, "a federal court may not issue a writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. The AEDPA standard under § 2254(d) is a "difficult" test to meet and is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the

benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The petitioner has the burden of proof and, with respect to § 2254(d)(1), review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.*

In applying AEDPA's standards, the relevant state court decision that is appropriate for federal habeas corpus review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008). Furthermore, the court will assume that, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Wilson v. Sellers*, 138 S. Ct. 1188, 1194 (2018). Additionally, AEDPA deference is not excused when state courts issue summary rulings. For example, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 62 U.S. 86, 99 (2011) (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)).

## IV. ANALYSIS

### A. Ground One: Alleged Conflict of Interest Between Trial Judge and Prosecutor

Petitioner first asserts that he is entitled to habeas relief in light of the "special relationship", detailed *infra*, between one of the assistant prosecutors who represented the State at Petitioner's trial, William P. Cunningham, and the trial judge, Edward J. Turnback, J.S.C. (*See* Am. Pet. at Addendum 1-2., ECF No. 5.) Petitioner avers that Judge Turnback and Assistant Prosecutor Cunningham acted in a partisan manner which adversely impacted his trial. Petitioner alleges a pattern of "obvious biasness given to Cunningham [by Judge Turnback] during the trial (*i.e.*, sustaining phantom objections [and] signaling him when to object)[.]" (*Id.*)

Petitioner raised this claim on direct appeal and during PCR proceedings. The Appellate

Division summarized the state courts' resolution of this claim as follows:

> On direct appeal, [Petitioner] claimed that he was denied a fair trial because of a "special relationship" between the trial judge and one of the assistant prosecutors who tried his case. The trial judge served as County Prosecutor before his appointment to the bench and hired the trial prosecutor during that time. [Petitioner] also noted that after the trial ended, both the judge and the trial prosecutor began working for the same law firm. We rejected these claims, finding that they lacked sufficient merit to warrant discussion in a written opinion.
>
> [Petitioner] raised the same conflict of interest claim in his PCR petition and urges that this issue is not precluded because our decision on his direct appeal was not an adjudication on the merits. . . .
>
> "Post-conviction relief is neither a substitute for direct appeal, *R.* 3:22-3, nor an opportunity to relitigate cases already decided on the merits." *State v. Preciose*, 129 N.J. 451, 459 (1992). We agree with the PCR judge that the claim raised in [Petitioner's] PCR petition "is identical, or substantially similar to the issue raised on direct appeal." As such, it is procedurally barred. *Id.* at 476.

*Hill*, No. A-0201-10T4, slip op. at 9 (N.J. Super. Ct. App. Div. Feb. 1, 2013).

In Ground One, Petitioner is again challenging the allegedly partisan behavior of Judge

Turnback and Assistant Prosecutor Cunningham during trial. Relevant Supreme Court precedent

makes clear that a criminal defendant tried by a partial judge is entitled to have his conviction set

aside, no matter how strong the evidence against him. *See Edwards v. Balisok*, 520 U.S. 641, 647

(1997); *Arizona v. Fulminante*, 499 U.S. 279, 308 (1991); *Tumey v. Ohio*, 2273 U.S. 510, 535

(1927). This Court has been unable to locate any similar precedent from the Supreme Court which

suggests that the partisan manner in which a prosecutor conducts himself at trial, in and of itself,

would entitle a criminal defendant to habeas relief. This is unsurprising. Indeed, a prosecutor, by

the very nature of his position, acts in a manner that is inherently against the interests of the

criminal defendant against whom is seeking to obtain a conviction. The Court therefore construes

that portion of Petitioner's Ground One claim challenging Assistant Prosecutor Cunningham's

alleged improper use of his "special relationship" with Judge Turnback to secure Petitioner's conviction as a prosecutorial misconduct claim. *Werts v. Vaughn*, 228 F.3d 178, 197 (3d Cir. 2000) ("In essence, Werts' claim sounds of prosecutorial misconduct.") Relevant Court precedent makes clear that habeas relief is appropriate when a prosecutor's misconduct has "'so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process.'" *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Such "prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" *Id.* (citing *United States v. Bagley*, 473 U.S. 667, 676, (1985) (quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976))); *accord Ramseur v. Beyer*, 983 F.2d 1215, 1239 (3d Cir. 1992); *Werts*, 228 F.3d at 197-98.

The Appellate Division found that Petitioner's Ground One claim lacked sufficient merit to warrant discussion in a written opinion. *Hill*, 2008 WL 2875792, at * 14. Petitioner has not presented the Court with any basis to find that the Appellate Division's resolution of this claim is contrary to, or otherwise represents an unreasonable application of, relevant Supreme Court precedent, or that this decision is the result of an unreasonable determination of the facts before it. Petitioner fails to cite to any specific portions in the record which support his otherwise unsubstantiated allegation that there was a pattern of "obvious biasness given to Cunningham [by Judge Turnback] during the trial[.]" This Court has likewise been unable to locate any evidence in the record which shows that Judge Turnback acted in an inherently partisan manner at trial. Petitioner similarly fails to present any basis for this Court to find that Assistant Prosecutor Cunningham acted improperly at trial, much less that he utilized his "special relationship" with Judge Turnback in a manner that so infected the trial with unfairness as to make his resulting conviction a denial of due process. This Court has not independently located any evidence in the

record which supports a contrary conclusion. In light of these considerations, this Court is unable to conclude that the Appellate Division's resolution of Petitioner's Ground One claim is contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts in light of the evidence before it. As such, this Court will deny habeas relief on Ground One.

## B. Grounds Two and Three: Ineffective Assistance of Counsel

Petitioner claims that he is entitled to habeas relief because he received ineffective assistance of counsel. More specifically, Petitioner asserts that his trial attorneys, Francisco Gonzalez and Philip Pagano, were ineffective where those attorneys: (1) informed the jury that counsel advised Petitioner not to testify; (2) failed to retain a forensic scientist as a defense expert to analyze a rubber glove and bungee cord used in the commission of Gwendolyn Boyd's murder; (3) failed to move for a mistrial when Investigator Mitchell continually spoke to Co-Defendant Scott in violation of the trial court's sequestration order; and (4) failed to call essential witnesses to testify.

### 1. *Legal Standard Governing Ineffective Assistance of Counsel Claims*

The Sixth Amendment guarantees the accused the "right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984). A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied. *Id.* at 687. First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-88. To meet this prong, a "convicted defendant making a claim of ineffective assistance must identify the acts or omissions

of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The court must then determine whether, in light of all the circumstances at the time, the identified errors fell "below an objective standard of reasonableness." *Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014).

Second, a petitioner must establish that counsel's "deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." *Strickland*, 466 U.S. at 669. To establish prejudice, the defendant must show that "there is a reasonable probability that the result of trial would have been different absent the deficient act or omission." *Id.* at 1083. On habeas review, it is not enough that a federal judge would have found counsel ineffective. The judge must find that the state court's resolution of the issue was unreasonable, a higher standard. *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

### 2. Trial Counsel Informing Jury that Petitioner was Advised Not To Testify

Petitioner first asserts that Francisco Gonzalez was ineffective because he informed the jury that he advised Petitioner not to testify at trial. Petitioner avers that "the only conclusion that the jury could draw from defense counsel's statement [was] that defense counsel had knowledge that Petitioner was guilty and that is why he advised [Petitioner] not to testify." (*See* Am. Pet. at Addendum 2, ECF No. 5.) Petitioner raised this claim during PCR proceedings. That claim was considered and rejected by the Appellate Division as follows:

> [Petitioner] claims his trial counsel was ineffective when he told the jury on summation that he advised [Petitioner] not to testify:
>
>> [COUNSEL]: We have chosen not to put [Petitioner] on the stand. That's the beauty of our system. [Petitioner] has the right not to testify, or to testify if he so desires. And [Judge Turnbach] will charge you in a couple of minutes that you cannot draw any adverse inference from the fact that [Petitioner] did not testify. You can't do that. That's his right. Those are the rules. One of the hardest things, and I have been doing this for 23 years, the hardest thing that

you can do as a defense attorney is to advise somebody whether to take the stand or not take the stand.

[The State's objection is sustained.]

[COUNSEL]; In this case, members of the jury, I advised [Petitioner] –

[The State objects again.]

> From this standard and rather typical method of explaining to a jury why a defendant does not testify at trial, [Petitioner] argues that "[t]he only conclusion that the jury could draw from defense counsel's statement is that defense counsel had knowledge that [Petitioner] was guilty and that is why he advised him not to testify." This argument is entirely speculative and it is just as likely that counsel made these remarks as part of his trial strategy. The strong presumption that these remarks might be considered sound trial strategy has not been overcome. *See Strickland, supra,* [466 U.S. at 693] ("Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.").

*Hill,* No. A-0201-10T4, slip op. at 10-11 (N.J. Super. Ct. App. Div. Feb. 1, 2013).

Upon independently reviewing the relevant portion of Mr. Gonzalez's summation in its entirety (*see* Jan. 27, 2006 Trial Tr. 56-58, ECF No. 14-25), this Court is likewise unable to find any basis to agree with Petitioner that "the only conclusion that the jury could draw from defense counsel's [above-statement] is that defense counsel had knowledge that the Petitioner was guilty[.]" Instead, that portion of counsel's closing remarks reminded the jury, *inter alia,* that Petitioner was presumed innocent, that it was the State's affirmative obligation to prove otherwise, that Petitioner was under no obligation to testify at trial, and that the jury was precluded from making any adverse inferences against Petitioner because he did not testify. (Jan. 27, 2006 Trial Tr. 56-58, ECF No. 14-25.) Based on those considerations, this Court finds that the Appellate Division's determination that Petitioner failed to overcome the presumption that these remarks were part of counsels' trial strategy – and accompanying rejection of this particular ineffective

assistance of counsel claim – was neither contrary to, nor an unreasonable application of, *Strickland* and its progeny.

### 3. Counsels' Failure to Retain a Third Forensic Expert

Petitioner next asserts that counsel "failed to retain a forensic scientist as a defense expert to analyze the rubber glove finger tip with the bungee cord to determine whether the bungee cord caused the glove finders to rip." (*See* Am. Pet. at Addendum 2, ECF No. 5.) Petitioner raised this claim during PCR proceedings. The Appellate Division rejected this claim as follows:

> [Petitioner] argues that his trial counsel was ineffective for failing to retain a forensic expert to analyze a ripped rubber glove found at the scene, to determine if the bungee cord used to strangle Boyd caused the glove to tear. He claims that such an analysis "would have established that co-defendant Scott committed the murder."

> When a defendant accuses an attorney of rendering ineffective assistance, "[j]udicial scrutiny of counsel's performance must be highly deferential." [*Strickland*, 466 U.S. at 689]. Consequently, to satisfy the two-prong *Strickland* test, a defendant "must do more than make bald assertions that he was denied the effective assistance of counsel. He must allege facts sufficient to demonstrate counsel's alleged substandard performance." *State v. Cummings*, 321 N.J. Super. 154, 170 (App. Div.), *certif. denied*, 162 N.J. 199 (1999). As to the second prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland, supra*, [446 U.S. at 694].

> In fact, [Petitioner's] counsel called several witnesses at trial, including two forensic experts. Philip Beesley, an employee of the New Jersey State Police Office of Forensic Science (OFS), testified as an expert in the field of biological stain analysis, and Joseph Petersack, a forensic scientist, also employed by OFS, testified that DNA samples of [Petitioner] and Scott were compared with swabs from the bungee cord and the gloves. Both witnesses provided testimony that was helpful to [Petitioner] and enabled his counsel to argue to the jury that Scott, not [Petitioner], had killed Boyd. [Petitioner's] claim that reasonable doubt would have been created in the minds of the jurors if another forensic expert been retained is purely speculative and finds no support in the record.

*Hill*, No. A-0201-10T4, slip op. at 11-13 (N.J. Super. Ct. App. Div. Feb. 1, 2013).

Upon independently reviewing Mr. Beesly and Mr. Petersack's testimony at trial (*see* Jan. 26, 2006 Trial Tr. 54-126, ECF No. 14-24), this Court agrees with the Appellate Division that both expert witnesses provided testimony that advanced Petitioner's claim that Co-Defendant Scott, and not Petitioner killed Ms. Boyd. This Court likewise agrees with the Appellate Division that Petitioner's "claim that reasonable doubt would have been created in the minds of the jurors if another forensic expert been retained is purely speculative and finds no support in the record." *Hill*, slip op. at 13. This Court therefore finds that the Appellate Division's resolution of this portion of Petitioner's Ground Two claim is neither contrary to, nor an unreasonable application of, Strickland and its progeny. This Court likewise finds that this determination was not the result of an unreasonable determination of the facts before the state court.

4. *Counsels' Failure to Move for a Mistrial After Investigator Mitchell Purportedly Spoke to Co-Defendant Scott During Trial*

Petitioner further claims that his trial counsel erred when they did not move for a mistrial after Lieutenant Joseph Mitchell, an investigator with the Ocean County Prosecutor's Office, spoke to Co-Defendant Scott during trial recesses and breaks. Petitioner claims that Investigator Mitchell did so solely for the purpose of "assist[ing] Scott in his trial testimony" and violated the trial court's sequestration order. (*See* Am. Pet. at Addendum 4, ECF No. 5.) Petitioner raised this argument on direct appeal and during PCR proceedings. (*See* Pet'r's Aug. 21, 2007 *Pro Se* Appeal Br. 10, ECF No. 14-4; Pet'r's July 20, 2011 PCR Appeal Br., ECF No. 14-10.) In both instances, the Appellate Division rejected this claim as being "without sufficient merit to warrant written discussion[.]" *Hill*, 2008 WL 2875792 at *14; *Hill*, No. A-0201-10T4, slip op. at 13 (N.J. Super. Ct. App. Div. Feb. 1, 2013).

The record demonstrates that a sequestration order was in effect for all witnesses – including Investigator Mitchell – during the pendency of Petitioner's trial. (*See* Jan. 17, 2006 Trial

Tr. 12-13, ECF No. 14-21 (parties discussing sequestration order on the record).) *Accord Hill*, 2008 WL 2875792 at *9 (summarizing Investigator Mitchell's trial testimony). That said, Petitioner fails to point to any specific instances in the record which lend support to his otherwise unfounded assertion that Investigator Mitchell and Co-Defendant Scott discussed Mr. Scott's testimony during trial recesses and breaks. Instead, during a post-trial interview, Investigator Mitchell affirmatively stated that to the extent he talked to Co-Defendant Scott at trial *after* Mr. Scott took the stand, it would have been regarding Mr. Scott's need for water, food, or bathroom breaks. (*See* Sept. 18, 2009 Investigation Report, ECF No. 14-10 at PageID: 438.) Investigator Scott also made clear that he was not allowed in the courtroom during Co-Defendant's Scott testimony and that he was not allowed to discuss that testimony because he was a witness subject to the trial court's sequestration order. (*Id.*)

Moreover, the record shows that both the trial court and Petitioner's counsel were keenly aware of the behavior of everyone in the courtroom, and took action when they believed that behavior could unfairly prejudice Petitioner's defense. (*See* Jan. 23, 2006 Trial Tr. 3, ECF No. 14-23 (Petitioner's counsel requesting mistrial where "the family members of Ms. Boyd cried out in some emotion" because of "the potential damaging effect that that may have on the jury[.]"); Jan. 26, 2006 Trial Tr. 48-49, ECF No. 14-24 (trial judge noting that his court officer told two women to stop taking notes during Co-Defendant Scott's testimony in light of the sequestration order and asking defense counsel to inquire further into that issue).)

In light of these considerations, this Court is unable to find that the Appellate Division unreasonably applied *Strickland* when it determined that Petitioner failed to demonstrate that his counsels' performance was deficient and/or that Petitioner suffered resulting prejudice based on counsel's failure to object to Investigator Mitchell's actions during trial. Indeed, in light of the

particular facts of Petitioner's case, the Court agrees with the Appellate Division that Petitioner "failed to present a *prima facie* case of ineffective assistance of counsel[.]" *Hill*, No. A-0201-10T4, slip op. at 13 (N.J. Super. Ct. App. Div. Feb. 1, 2013). This Court finds that the Appellate Division's resolution of this portion of Petitioner's Ground Two claim is not contrary to, nor an unreasonable application of, clearly established federal law, and did not result in a decision based on an unreasonable determination of the facts before it.

### 5. Counsels' Failure to Call Three Witnesses

Petitioner also asserts that his counsel was ineffective for failing to call: (1) Everton Hunter, a New Jersey Department of Corrections Officers; (2) Patricia Baranay, a social worker; and (3) Ali Baker, a cousin of Co-Defendant Scott, to testify at trial. (*See* Am. Pet. at Addendum 5, ECF No. 5.) Petitioner raised these ineffective assistance of counsel-related claims during PCR proceedings. (*See, e.g.*, Pet'r's July 20, 2011 PCR Appeal Br. 22-23, ECF No. 14-10 at PageID: 331-32.) The Appellate Division expressly found that Petitioner, in raising these claims, "failed to present a *prima facie* case of ineffective assistance of counsel" and that these claims were otherwise "without sufficient merit to warrant written discussion[.]" *Hill*, No. A-0201-10T4, slip op. at 13 (N.J. Super. Ct. App. Div. Feb. 1, 2013).

Petitioner's claim that counsel was ineffective in failing to call these witnesses – like Petitioner's other ineffective assistance of counsel claims – is governed by *Strickland*. Again, *Strickland* requires that a defendant "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *United States v. Graves*, 613 F. App'x 157, 159 (3d Cir. 2015) (quoting *Strickland*, 466 U.S. at 689) (internal quotation marks omitted). When presented with such a claim, courts are "required not simply to give [the] attorney[] the benefit of the doubt, but to affirmatively entertain the range of possible reasons [petitioner's]

counsel may have had for proceeding as [he] did." *Branch v. Sweeney*, 758 F.3d 226, 235 (3d Cir. 2014) (alterations in original) (quoting *Pinholster*, 563 U.S. at 195).

Here, Petitioner asserts that Officer Hunter would have testified that he never spoke with Petitioner on the night of Ms. Boyd's murder. (Am. Pet. at Addendum 5, ECF No. 5.)  Petitioner has not provided a certification or affidavit from Officer Hunter which supports this assertion. Petitioner nonetheless avers that this information would have undermined Co-Defendant Scott's testimony that Petitioner called Officer Hunter to request "help and assistance" and would have given credence to Petitioner's claim that Mr. Scott instead borrowed Petitioner's phone, accidentally dialed Officer Hunter, and hung the phone up before speaking with Mr. Hunter. (*Id.*) Petitioner's claims regarding the additional testimony Officer Hunter would have provided fail to support an award of habeas relief.  Even assuming that Officer Hunter would have testified that he never spoke with Petitioner on the night in question, Petitioner has still failed to demonstrate how this additional testimony would have resulted in the outcome of his trial being different.  Indeed, the fact that Officer Hunter did not speak with Petitioner on the night of Ms. Boyd's murder does not, in and of itself, have any bearing on whether Petitioner murdered Ms. Boyd.  Insomuch as Petitioner is claiming that Officer Hunter's testimony would undermine Co-Defendant Scott's otherwise unimpeachable credibility, the record demonstrates that Petitioner's counsel gave the jury more than enough reason to question Mr. Scott's truthfulness.  (*See* Jan. 24, 2006 Trial Tr. 69-92, ECF No. 14-22 (relevant portions of Attorney Gonzalez's cross-examination of Mr. Scott).) The same can be said with respect to counsels' decision to not call Ali Baker to testify.  Again, Petitioner has not provided a certification from Mr. Baker.  Even assuming that Petitioner is correct that Mr. Baker would have told the jury that Co-Defendant Scott had robbed him in the past (*see* Am. Pet. at Addendum 5-6), this Court is hard-pressed to believe that this information would have

further undermined Co-Defendant Scott's credibility in light of Attorney Gonzalez's scathing cross-examination of Mr. Scott.

Petitioner also claims that counsel was ineffective for failing to call Patricia Baranay as a witness. (*See* Am. Pet. at Addendum 5.) Petitioner asserts that Ms. Baranay would have testified that she copied "all of [Petitioner's] personal legal letters to his attorney containing trial strategy[.]" Petitioner further claims that Ms. Baranay would have told the jury that the Ocean County Prosecutor's Office obtained the copies of Petitioner's letters that Ms. Baranay produced and utilized the information therein to Petitioner's detriment at trial. (*Id.*) Petitioner has not provided a certification or affidavit from Ms. Baranay which supports this assertion, and has similarly failed to provide copies of the letters that were purportedly copied by Ms. Baranay. Petitioner has also failed to provide any details about the particular trial strategy-related information that was improperly obtained and utilized by the prosecutors at trial, and has likewise failed to indicate how that information was utilized to his detriment. In short, Petitioner has failed to present any credible evidence – in the record or otherwise – which supports with his otherwise unsubstantiated claims about Ms. Baranay's testimony.

In light of the foregoing, this Court cannot find that the Appellate Division unreasonably applied *Strickland* and its progeny when it found that Petitioner failed to present a *prima facie* claim of ineffective assistance of counsel with respect to counsels' decision to not call Officer Hunter, Mr. Baker, and Ms. Baranay to testify at trial. The Appellate Division's resolution of Petitioner's Ground Three claim is therefore not contrary to, nor an unreasonable application of, clearly established federal law, and did not result in a decision based on an unreasonable determination of the facts.

## 6. Conclusion

Under the highly deferential standard of review governing ineffective assistance of counsel claims in § 2254 habeas matters, and for the additional reasons set forth above, this Court is unable to find that the Appellate Division unreasonably applied clearly established federal law when it determined that Petitioner failed to present a *prima facie* claim of ineffective assistance of counsel, *i.e.*, that Petitioner failed to demonstrate that his counsels' performance was deficient and/or that Petitioner suffered resulting prejudice, in light of the particular facts of Petitioner's case. *Hill*, No. A-0201-10T4, slip op. at 13 (N.J. Super. Ct. App. Div. Feb. 1, 2013). This Court finds that the Appellate Division's resolution of Petitioner's Ground Two and Ground Three claims is neither contrary to, nor an unreasonable application of, *Strickland* and its progeny, nor did it result in a decision based on an unreasonable determination of the facts in light of the evidence before it. As such, the Court will deny habeas relief as to Grounds Two and Three.

## C. Ground Four: The Attire of Petitioner and Co-Defendant Scott At Trial

Petitioner raises two separate claims in Ground Four. First, Petitioner asserts that the trial court improperly permitted Co-Defendant Scott to testify in prison clothing and while shackled. Second, Petitioner claims that his feet were shackled at the defense table, and that members of the jury were able to see these shackles. Both of Petitioner's Ground Four assertions were discussed by the Appellate Division in its opinion affirming the denial of PCR relief to Petitioner:

> After [Petitioner] filed a notice of appeal from the April 8, 2010 order [of the PCR court denying PCR relief], he moved to supplement the record with two certifications claiming that some jurors may have seen that he was shackled during the trial and that Michael Scott wore prison garb and was also shackled when he testified. We denied the motion to supplement the record but entered an order for a limited remand to allow the PCR judge to consider the certifications.
>
> On remand, a different judge conducted a hearing where [Petitioner] and the two prosecutors who tried the case testified. The second PCR judge filed a written memorandum containing extensive and detailed findings of facts.

The judge rejected [Petitioner's] claim that he was wearing leg shackles during trial as not believable. The judge credited the testimony and certifications of both prosecutors who recalled that [Petitioner] was not wearing leg irons during trial. The judge also noted both of [Petitioner's] trial counsel submitted certifications and neither could remember him wearing leg shackles. [Petitioner] testified that he had two different suits to wear for trial with a variety of shirts and ties. The trial record indicates that when some of [Petitioner's] civilian clothes were missing, the trial judge ordered the warden to investigate the matter. Given the "great lengths" that [Petitioner's] counsel and the trial court went to protect his rights, the second PCR judge found [Petitioner's] claim that he appeared in court wearing leg shackles to be "incredulous."

. . . .

As to [Petitioner's] claim that Michael Scott testified at trial wearing prison apparel, the judge found that [Petitioner's] counsel's failure to object to Scott's dress was a tactical decision intended to have the jury "consider this incarcerated witnesses' testimony in an unfavorable manner." The judge noted that, while *State v. Artwell*, 177 N.J. 526 (2003), prohibited defense witnesses from appearing at trial in prison garb, Scott was called by the State. The judge also noted that trial took place in January 2006, prior to our decision in *State v. Russell*, 384 N.J. Super. 586 (App. Div. 2006), where we held that a witness can never testify in prison garb. The judge concluded that there was no reliable evidence that [Petitioner] was prejudiced by Scott appearing in prison clothing.

*Hill*, No. A-0201-10T4, slip op. at 4-6 (N.J. Super. Ct. App. Div. Feb. 1, 2013).

In *Illinois v. Allen*, 397 U.S. 337 (1970), the Supreme Court recognized that requiring a criminal defendant to appear in shackles before a jury may result in an unfair trial. *See id.* at 344 ("[n]ot only is it possible that the sight of shackles . . . might have a significant effect on the jury's feelings about the defendant, but the use of th[e] technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold."); *accord Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986) (shackling a defendant during trial is an "inherently prejudicial practice" that "should be permitted only where justified by an essential state interest specific to each trial."); *Deck v. Missouri*, 544 U.S. 622, 633 (2005) (noting that the

appearance of a criminal defendant in shackles "almost inevitably affects adversely the jury's perception of the character of the defendant").

In this case, however, the PCR court made an express factual finding that Petitioner was not shackled during trial. That finding is abundantly supported by the testimony and certifications considered by the PCR court. This factual determination is entitled to a presumption of correctness and there is nothing in the record which suggests to this Court that the PCR court's determination was unreasonable in light of the evidence before it. *See* 28 U.S.C. § 2254(e)(1) ("a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."); *accord Rountree v. Balicki*, 640 F.3d 530, 541-42 (3d Cir. 2011); *Simmons v. Beard*, 590 F.3d 223, 231 (3d Cir. 2009)). As such, Petitioner is not entitled to relief on the basis of his contrary assertion that he was shackled during trial.

Petitioner also asserts that he is entitled to habeas relief because his co-defendant testified in prison garb. In *Estelle v. Williams*, 425 U.S. 501, 506 (1976), the Supreme Court held that requiring a defendant to wear "identifiable prison clothes" violated his due process right to a fair trial. *Estelle*, however, only speaks to the rights of criminal *defendants* at trial; it does not speak to the attire of other witnesses who testify at trial. Importantly, "[t]he Supreme Court . . . has never held that the prohibition on compelling a defendant to wear prison garb applies to witnesses. Moreover, no extension of the prohibition to witnesses follows from the reasoning of the relevant Supreme Court decisions [cited above]." *Green v. Warren*, No. 12-6148, 2013 WL 6865420, at *14 (D.N.J. Dec. 20, 2013); *accord Villegas v. D'Ilio*, No. 15-3420, 2016 WL 706195, at *6 (D.N.J. Feb. 22, 2016) ("The Supreme Court has . . . never extended the *Estelle* rule regarding

prison garb to non-defendant witnesses"), *cert. of appealability denied*, No. 16-1649 (3d. Cir. May 26, 2016).

In light of these considerations, the fact that Mr. Scott testified on behalf of the State in prison garb while shackled did not violate Petitioner's constitutional rights under "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *accord United States v. Brooks*, 125 F.3d 484, 499 (7th Cir. 1997) (noting that "a defendant has the right for his own witness to appear without physical restraints[,]" and that no similar right exists with respect to government witnesses). Instead, it fully appears that this portion of Petitioner's Ground Four claim was "adjudicated 'on the merits' in state court" and that "the state court's adjudication [of that claim in no way] 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law.'" *Lamas*, 850 F.3d at 133-34 (quoting 28 U.S.C. § 2254(d)(1)).

Moreover, even if this Court were to conclude that a witness testifying for the prosecution while dressed in prison garb and in shackles could qualify as a constitutional violation, the Court would nonetheless find that this purported constitutional error was harmless with respect to Co-Defendant Scott testifying while shackled and wearing prison attire at Petitioner's trial. For purposes of federal habeas review, a constitutional error that implicates trial procedures is considered harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Harmless error analysis has been applied to claims involving the use of prison clothing and shackles. *See United States v. Salehi*, 187 F. App'x 157, 174-75 (3d Cir. 2006); *Lakin v. Stine*, 431 F.3d 959, 966 (6th Cir. 2005); *United States v. Martin*, 964 F.2d 714, 721 (7th Cir. 1992).

Here, the record makes clear that the jury was well aware of Mr. Scott's admitted guilt in this case and that he would be testifying on behalf of the State. (*See, e.g.*, Jan 24, 2006 Trial Tr. 91, ECF No. 14-22.) It therefore follows that Mr. Scott would testify in prison garb, and thus, that he did in fact testify in prison garb and while shackled – if true – would not come as a surprise to the jury, much less prejudice Petitioner's defense. "No prejudice can result from seeing that which is already known." *Green*, 2013 WL 6865420, at *14 (quoting *Stahl v. Henderson*, 472 F.2d 556, 557 (5th Cir. 1973)). Petitioner's failure to articulate how Mr. Scott's in-court appearance had a substantial and injurious effect on the jury's verdict or otherwise prejudiced his defense becomes particularly apparent in light of this reality. *See id.* at *14 (no prejudice to defendant where two government witnesses testified while wearing prison garb because "the criminal records of the two witnesses were provided to the jurors in the course of their testimonies."); *see also Brooks*, 125 F.3d at 499 (witness's testimony about her convictions and prisoner status dispelled any prejudice arising from her prison garb); *United States v. Adams*, 1 F.3d 1566, 1584 (11th Cir. 1993) (citing cases and finding no prejudicial error as a result of co-defendants testifying in prison clothes); *Cook v. Beto*, 425 F.2d 1066, 1067 (5th Cir. 1970) (no prejudice flowed from an accused's co-defendant being brought into the courtroom for identification wearing a prison uniform), *cert. denied*, 400 U.S. 944; *Johnson v. Spalding*, 510 F. Supp. 164 (E.D. Wash. 1981) (in habeas petition, no prejudice flowed from witnesses testifying in prison clothing), *aff'd*, 669 F.2d 589 (9th Cir.), *cert. denied*, 459 U.S. 942 (1982). In sum, and for the additional reasons detailed above, the Court finds that the arguments advanced by Petitioner in Ground Four fail to support an award of habeas relief.

## D. Ground Five: Improper Instructions to Jury

In Ground Five, Petitioner challenges the manner in which the trial court charged the jury. Petitioner claims that the trial court improperly instructed the jury that if they found "either [Petitioner or Co-Defendant Scott] committed the crime of murder . . . then the [Petitioner] would be guilty of the crime of murder." (*See* Am. Pet. at Addendum 7, ECF No. 5.) Petitioner claims that this portion of the charge left the jury with "no option other than to convict the Petitioner of both murder and conspiracy, even if the jury found that [Petitioner] did not commit the murder[.]" (*Id.*)

The Appellate Division rejected this claim on direct appeal as being "without sufficient merit to warrant discussion in a written opinion." *Hill*, 2008 WL 2875792, at *1, *14. Initially, the Court notes that questions relating to jury charges are normally matters of state law, and do not constitute claims for federal habeas review. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to re-examine state court determinations on state-law questions."). As such, "the fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Id.* at 71–72.

However, to the extent Petitioner's Ground Five arguments can be construed as a federal claim, a habeas court must consider "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process . . . not merely whether the instruction is undesirable, erroneous, or even universally condemned." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (internal citation and quotation marks omitted). A habeas petitioner must establish that the instructional error "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (citation and quotation marks omitted). The error must have resulted in "actual prejudice." *Id.* (citation omitted). Moreover, it is "well established" that

instructions "may not be judged in artificial isolation," but must be viewed in the context of the overall charge and the trial record. *Cupp v. Naughton*, 414 U.S. 141, 146 (1973).

Here, the portion of the charge challenged by Petitioner in Ground Five reads, in its entirety, as follows:

> If you find [Petitioner] guilty of [conspiracy], that is, that he conspired to murder Gwendolyn Boyd with Michael Scott, and if you further find that the State has proven beyond a reasonable doubt that in furtherance of the conspiracy either one of them committed the crime of the murder of Gwendolyn Boyd as I've instructed you on the elements of that crime, then [Petitioner] would be guilty of the crime of murder.

> Of course, if the State has failed to prove the existence of the conspiracy as alleged in count One or that the murder was committed in furtherance of that conspiracy, then [Petitioner] cannot be found guilty of the crime of murder on that basis.

(Jan. 27, 2006 Trial Tr. 30, ECF No. 14-26.)

When reviewing that portion of the charge now being challenged by Petitioner in this fuller context, it becomes readily apparent that Petitioner is incorrect in claiming that the charge to the jury unconditionally required them to convict Petitioner of murder upon finding that Co-Defendant Scott killed Ms. Boyd. Indeed, the above-referenced portion of the jury charge makes clear the jury could not convict Petitioner of murder if the State failed to prove the existence of a conspiracy between Petitioner and Co-Defendant Scott or failed to prove that Co-Defendant Scott murdered Ms. Boyd in furtherance of the conspiracy he and Petitioner entered into. The jury is presumed to have followed this instruction. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Petitioner has likewise failed to demonstrate how this instruction – when viewed in its broader context – "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

In light of the foregoing, the Court is satisfied that the challenged jury instruction did not violate Petitioner's constitutional rights. The Court additionally finds that the Appellate Division's

rejection of this claim was neither contrary to, nor an unreasonable application of Supreme Court precedent. Accordingly, Petitioner is not entitled to habeas relief on Ground Five.

## E. Ground Six: Petitioner's Preclusion from Sidebar During Voir Dire

Petitioner claims that he was denied of his right to a fair trial because he was precluded from being physically present at sidebar conferences during voir dire. The Appellate Division provided the following detailed analysis regarding this claim in its opinion affirming Petitioner's conviction on direct appeal:

> [Petitioner] contends the lower court committed reversible error in denying his request to be physically present at all sidebar conferences during jury voir dire. "[U]nder Rule 3:16, a defendant, who requests it, ordinarily has a right of presence at voir dire sidebar conferences." *State v. W.A.*, 184 N.J. 45, 48, 875 A.2d 882 (2005). However, "presence at sidebar need not always mean physical presence." *Id.* at 59, 875 A.2d 882. Where there are security issues that militate against a defendant's physical presence at a voir dire sidebar, a court may utilize other methods to ensure a defendant is able to meaningfully participate in voir dire. *Id.* at 48, 875 A.2d 882. These methods may include the use of electronic equipment, such as wireless listening devices, the modified struck-jury system, whereby all jurors are individually questioned in open court with the defendant present while all other jurors are absent, and the lawyer-shuttle process. *Id.* at 48, 60, 875 A.2d 882.

> Notably, the lawyer-shuttle process may only be employed as a last resort when there are legitimate security concerns, no electronic means are available, and the juror is unwilling to speak in open court. *Id.* at 61, 875 A.2d 882. Under this process, "the lawyer who attends each sidebar thereafter consults with his client regarding what has transpired, thus allowing the client to seek further probing or to acquiesce in the lawyer's recommendation." *Ibid.* A defendant may also request to listen to the tape, or review the court stenographer's notes, of a sidebar colloquy involving non-excused jurors before making his decision whether to exercise a peremptory challenge. *Ibid.* While this process is not as effective for peremptory challenge purposes as the others because it interposes the lawyer between the client and the juror, "it is a potential way to secure a defendant's 'presence' and participation in voir dire when direct participation is impractical." *Ibid.*

> A defendant's exclusion from sidebar, after having requested presence, and in the absence of a substituted process, does not automatically warrant reversal. *Id.* at 64, 875 A.2d 882. Rather each case must be assessed under a harmless error analysis. *Ibid.* Significantly, "a defendant's absence from the sidebar examination of a juror who does not deliberate in the case is necessarily harmless." *Ibid.*

Just prior to jury selection in the instant case, defense counsel requested that defendant be permitted to be physically present during any sidebar conferences that might take place during jury selection. The trial court responded:

> Well, that presents certain difficulties, given the physical layout of our particular courtroom here. I know that the Administrative Office of the Courts is in the process of obtaining certain high-tech equipment which would enable [Petitioner] to sit at counsel table and electronically hear what's said at side bar.
>
> I have inquired about that equipment, anticipating a twelfth-hour application, and am informed that it is not yet available to us here.
>
> Given the physical layout of the court, as you are aware, side bar is at the far end of the bench here, and I would say, I guess, seven feet, not really even that, six feet maybe by seven feet in area, it will have to accommodate at side bar the court reporter, four counsel and a juror.
>
> If [Petitioner] were to be physically brought to the side bar, that would entail [Petitioner] and two sheriff's officers also. And just, we cannot physically accommodate that here. So, given our physical limitations and the absence of the equipment in question, I'm going to not be able to grant your request for his physical presence.
>
> However, I certainly will, after each side bar, give you sufficient time to return to your table and explain as long as it takes for you to advise [Petitioner] of everything that was said, and get his input with regard to it.

Defense counsel subsequently inquired as to whether the judge was suggesting there was both a security issue and an accommodation issue involved, or just an accommodation issue. The court replied that counsel's request raised both issues. The judge noted that, given the nature of the charges, two officers would have to be present with [Petitioner] at all times. Defense counsel then suggested that only one prosecutor and one defense attorney participate in the sidebars. However, after the State attorneys objected to this proposed procedure, the court adhered to its original ruling.

Thereafter, the lawyer-shuttle system was employed in connection with all of the sidebar conferences during voir dire. Ultimately, four jurors who were the subject of sidebar conferences were part of the final deliberating jury: Ms. Beard, Ms. Sambella, Ms. Vasquez, and Ms. Howiessen.

[Petitioner] argues the trial judge erred in relying upon accommodation factors rather [than] security issues in denying his request to be physically present at all voir dire sidebar conferences. According to [Petitioner], "the trial court did not conclude[ Petitioner] could not be present at sidebar conferences for security reasons," but rather that [Petitioner] simply had to be accompanied by two sheriff's officers to any such conferences. In [Petitioner's] view, his request to be physically present at the sidebar conferences should have been granted even if it meant squeezing everyone into a small space or restricting the number of attorneys present during the conferences.

Regardless of how [Petitioner] chooses to view it, the threshold problem facing the trial court in acceding to [Petitioner's] request was security. As the court noted, the fact that [Petitioner] had been charged with a violent and deadly crime and was facing life in prison required, for the safety of all in the courtroom, that he be accompanied by two sheriff's officers at all times. Moreover, the trial court was in the best position to decide how many people could fit into the small area available for sidebar conferences. While [Petitioner] maintains the judge should have excluded counsel from these conferences so as to permit him to attend, [Petitioner] has failed to identify any case law endorsing such an approach, and [Petitioner] ignores the fact that he did not have a paramount right to be physically present at the sidebar conferences because he was a security risk. Accordingly, we find neither abuse of discretion nor reversible error by the trial court.

*Hill*, 2008 WL 2875792, at *6-8.

Petitioner is not entitled to habeas relief on Ground Six. Petitioner has cited no Supreme Court precedent, and this Court has not located any, indicating that a criminal defendant has the constitutional right to be physically present at sidebar conferences with his attorney during voir dire. *See Davenport v. Ricci*, No. 09-4997, 2012 WL 2863662, at *13 (D.N.J. July 11, 2012) (noting that the Supreme Court has not addressed whether a self-represented defendant's exclusion from sidebar conferences implicates that defendant's constitutional rights); *accord United States v. Schwartz*, 315 F. App'x. 412, 416 n.1 (3d Cir. 2009) (the exclusion of a self-represented defendant from a sidebar conference "does not automatically constitute a Sixth Amendment violation.") (citation omitted). Instead, relevant Supreme Court precedent makes clear that voir dire "is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion." *Connors v. United States*, 158 U.S. 408, 413 (1895); *accord Robinson v.*

*Johnson*, No. 15-8097, 2018 WL 2859672, at *14 (D.N.J. June 11, 2018). Petitioner has therefore not shown that the Appellate Division's resolution of his exclusion from sidebar claim was "contrary to clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Petitioner has likewise failed to argue that his exclusion from sidebar during voir dire prejudiced his defense. Indeed, Petitioner does not claim that the trial court's utilization of the shuttle method adversely influenced the jury's verdict; the Court has not located any evidence in the record which suggests otherwise. Again, a writ of habeas corpus may issue only if the reviewing court finds that a constitutional error "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623; *accord Szuchon v. Lehman*, 273 F.3d 299, 319 (3d Cir. 2001). Here, "Petitioner has not shown that had counsel included Petitioner at sidebar, there is a reasonable probability the outcome of the trial would have been different." *Robinson*, 2018 WL 2859672, at *15. In light of the foregoing, the Court will deny habeas relief on Ground Six.

## F. Certificate of Appealability

Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). For the reasons expressed above, Petitioner has failed to make a substantial showing that he was

denied a constitutional right. As jurists of reason could not disagree with this Court's resolution of the claims, the Court shall deny Petitioner a certificate of appealability.

## V. CONCLUSION

For the foregoing reasons, the Court grants Petitioner's motion to expand the record, denies Petitioner's habeas petition, and declines to issue a certificate of appealability. An accompanying Order will be entered.

_8/25/18_
Date

PETER G. SHERIDAN
U.S. District Judge